UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/17/2022

———————————————————— x

In Re:
BERNARD L. MADOFF INVESTMENT
SECURITIES LLC,

No. 1:21-cv-02334-CM

———————————————————— x

## DECISION AND ORDER ON APPEAL

McMahon, J.:

    This is an appeal from an order and judgment of the United States Bankruptcy Court for

the Southern District of New York ("Bankruptcy Court") (Morris, C.B.J.) granting summary

judgment in favor of Plaintiff-Appellee Irving H. Picard (the "Trustee"), Trustee for the

Liquidation of Bernard L. Madoff Investment Securities, LLC ("BLMIS" or "Debtor") on his

claims, and denying the Appellants' cross-motion to dismiss the Trustee's claims for lack of

subject matter jurisdiction.

    The case – like many a predecessor case litigating exactly the same issues – arises from the

Bernard L. Madoff ("Madoff") Ponzi scheme and the resulting consolidated liquidation of BLMIS

(the "BLMIS liquidation") pursuant to the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa–

78lll ("SIPA"). Until his arrest in December 2008, Madoff orchestrated an ongoing Ponzi scheme

as a broker-dealer registered with the SEC, first as a sole proprietorship and, since 2001, as the

limited liability company BLMIS. The Ponzi scheme's basic contours were that Madoff induced

investors to open discretionary trading accounts with BLMIS for the purported purpose of buying

and selling securities. However, no securities were bought and instead, BLMIS used the money

invested by BLMIS customers to make distributions to other BLMIS customers.

    From 1993 through 2008, Seymour Epstein and his corporation Shelburne Shirt Company,

Inc. ("Shelburne") were investment advisory ("IA Business") customers of Madoff and BLMIS. In the two years prior to the collapse of the Ponzi scheme, Seymour Epstein and Shelburne withdrew more from their accounts than they had deposited – alleged "fictitious profits," or customer money that had been entrusted to BLMIS and used in furtherance of the Ponzi scheme.

On December 11, 2008, Madoff was arrested on federal charges for his criminal scheme. A few days later, BLMIS was placed in liquidation pursuant to SIPA for the protection of BLMIS customers, and Irving Picard was appointed Trustee for the BLMIS liquidation.

Less than a week later, Seymour Epstein died.

In November 2010, the Trustee sued the Estate of Seymour Epstein (the "Seymour Estate"), his widow Muriel Epstein as Executrix of the Seymour Estate and Trustee of the Trusts created by the Last Will and Testament of Seymour Epstein (the "Seymour Trusts"), Herbert C. Kantor as Trustee of the Seymour Trusts, and Shelburne, in order to claw back transfers made to Seymour and Shelburne from BLMIS bank accounts within the two-year period preceding the BLMIS liquidation, on the ground that they were "fictitious profits." Subsequent transfer counts were brought against Randy Epstein Austin, Robert Epstein, Jane Epstein, and Susan Epstein Gross as recipients of transferred funds.

Appellants countered that the transfers from the IA Business were legitimate profits distributed to them from Madoff's personal bank accounts, not from BLMIS bank accounts, so the Trustee did not have standing to avoid and recover these transfers.

The Trustee moved for summary judgment on his claims. Noting that these exact same claims had been litigated over and over again in other avoidance proceedings, Chief Judge Morris granted that motion, on the ground that the transfers were, in fact, transfers of BLMIS' customer property and must be turned over to the Trustee. She entered judgment for the Trustee in the amount

of $2,622,438.55 – $1,110,538.16 against the Seymour Estate, Muriel Epstein as Executrix of the Seymour Estate and Trustee of the Seymour Trusts, Herbert C. Kantor as Trustee of the Trustee of the Seymour Trusts, and Jane Epstein, Randy Austin, and Susan Gross as successor co-trustees to Herbert C. Kantor, and $1,511,900.39 against Shelburne – and ordered that these sums, together with prejudgment interest, be returned to the BLMIS estate.

On appeal, the Appellants argue that the Bankruptcy Court did not have jurisdiction to enter a final judgment and erred in granting the Trustee's motion because there were genuine issues of fact as to whether BLMIS or Madoff owned the bank accounts at issue. They seek vacatur of the judgment and a trial on the allegedly disputed questions of material fact.

For the following reasons, (1) the Bankruptcy Court's order granting summary judgment in favor of Appellees is treated as a report and recommendation; (2) the Court declines to adopt the Report as its opinion, because I disagree with the Bankruptcy Court's reasoning; but (3) after making its own findings of fact on *de novo* review, the Court grants the Trustee's motion, and directs that judgment be entered by the Clerk of this Court as indicated at the end of this opinion.

## BACKGROUND

### A. The Parties

The Appellants are the Seymour Estate, Muriel Epstein as Executrix of the Seymour Estate and Trustee of the Seymour Trusts, Herbert C. Kantor as Trustee of the Seymour Trusts, the Shelburne Shirt Co. ("Shelburne"), and Jane Epstein, Randy Austin, and Susan Gross (together, the "Appellants").[1] Appellant Kantor died in February 2014 while this case was pending. The Trustee did not seek to substitute any successor or representative in his stead.

---

[1] Robert Epstein, while also sued by the Trustee on subsequent transfer counts, does not join the appeal.

Seymour Epstein held BLMIS Account No. 1CM049 (the "Seymour Account"). In the two-year period preceding the BLMIS liquidation – between December 11, 2006 and December 11, 2008 – Seymour Epstein withdrew $1,110,538.16 more than was deposited in the Seymour Account. Seymour Epstein died on December 19, 2008.

Shelburne, a New York corporation of which Seymour Epstein was the president, held BLMIS Account No. 1CM005 in the name of "Shelburne Shirt Co. c/o Seymour Epstein" (the "Shelburne Account"). In the two-year period preceding the BLMIS liquidation, Shelburne withdrew $1,511,900.39 more than was deposited in the Shelburne Account. Shelburne was dissolved on December 28, 2009 following Seymour Epstein's death.

Appellees are the Trustee and the Securities Investor Protection Corporation ("SIPC"), a statutory intervenor in all liquidations under the SIPA. *See* SIPA § 78eee(d).

**B. The 2001 Conversion of Madoff's Sole Proprietorship to Limited Liability Company**

In January 1960, Madoff registered as a broker-dealer with the SEC. From that time until 2001, Madoff's firm operated as a sole proprietorship. After 2001, Madoff's business operated under the name of the limited liability company – Bernard L. Madoff Investment Securities LLC (referred to in this decision as "BLMIS").[2] The parties' primary dispute centers on this 2001 change in corporate form.

It is undisputed that in 2001, Madoff filed an Amended Form BD with the SEC using his SEC registrant number in which he attested that: "Effective January 1, 2001, predecessor [the sole proprietorship] will transfer to successor [BLMIS] all of predecessor's assets and liabilities related

---

[2] I note that the Appellants call the post-2001 entity "the LLC" and the pre-2001 sole proprietorship "BLMIS." I decline to adopt the Appellants' terminology; in the many various Madoff cases, the courts use "BLMIS" to refer to the LLC, for reasons that will become obvious when the undisputed facts are summarized. *See In re Bernard L. Madoff Investment Securities LLC*, 830 Fed.Appx. 669, 670 (2d Cir. 2020); *Securities Investor Protection Corporation v. Bernard L. Madoff Investment Securities LLC*, No. 20-cv-3140 (JGK), 2021 WL 1141638, at *3 (S.D.N.Y. Mar. 24, 2021). I do the same.

to predecessor's business. The transfer will not result in any change in ownership or control." (Dkt. No. 18-4, at AA1625). Madoff further certified that no "accounts, funds, or securities of customers of the applicant are held or maintained by such other person, firm, or organization." (*Id.* at AA1619). By this amended form, "all [of the sole proprietorship's] assets and liabilities" were assumed by BLMIS, and all "accounts, funds, or securities of customers" were transferred to the LLC. (*Id.* at AA1625, 1619).

On this Amended Form BD, Madoff failed to check a box indicating that he operated an IA Business. (*Id.* at AA1623). The simplest explanation for this failure was that the IA Business was not registered with the SEC until 2006 in any event. (*See* Dkt. No. 30-4, TA0461–TA0664 ("Dubinsky Rep."), at ¶39). When Madoff did finally register the IA Business in 2006, he did so as BLMIS (the LLC), using the same SEC registrant number as BLMIS. (*Id.*).

With the conversion in 2001, the assets transitioned to BLMIS included the bank accounts Madoff used to carry out his business. These bank accounts included JPMorgan account #xxx-xx1703 (the "703 Account") and the JPMorgan account #xxxxxxxxx1509 (the "509 Account", together the "JPMorgan Accounts"). (Dkt. No. 30-3, TA0422–TA0455 ("Collura Rep."), at ¶ 17). This transition is reflected in, *inter alia*, the following changes: After 2001, the account holder of the JPMorgan Accounts was changed from "Bernard L. Madoff" to "Bernard L. Madoff Investment Securities" (*id.* at ¶¶ 20 n.7, 25 n.9); both the JPMorgan Accounts were designated as "Commercial Checking" accounts of BLMIS on the face of the statements; and the account statements were addressed to the attention of BLMIS employees at the BLMIS business address at 885 Third Avenue, New York, New York. (*See* Dubinsky Rep., at ¶340 n.285, Exs. 31, 32).

However, Madoff admittedly never informed Chase Bank of the change in corporate structure (Dkt. No. 18-3, at AA1510 ¶ 10), and BLMIS continued to use checks drawn on the 509

Account that listed the name "Bernard L. Madoff" in the top left corner. (*Id.* at AA1516-17, ¶¶40, 49; *see e.g.*, Dkt. No. 18-7, at AA1956, AA1972).

### C. The Operation of BLMIS and Fraudulent Scheme

BLMIS operated three businesses: (1) a proprietary trading business; (2) a market-making business; and (3) the IA Business. (Dubinsky Rep., at ¶ 36). The proprietary trading business traded for its own account to make money for BLMIS. (*Id.* ¶¶ 36, 46). The market-making business made markets in certain stocks, bonds, warrants, and rights. (*Id.*).[3] The IA Business was advertised as trading stocks, equities, and options on behalf of its customer accounts, although no stocks, equities or options were actually traded on behalf of IA Business customers. (*Id.* ¶¶ 41-44). All three businesses were part of BLMIS. (*Id.* ¶¶ 36, 48).

It is undisputed that Madoff ran his infamous fraud through the IA Business. (*See* Dkt. No. 27, at 7-8). And while IA Business customers were made to believe that the IA Business was engaged in legitimate trading in securities, including "T-Bill" purchases reflected on customer account statements (*see e.g.*, Dkt. No. 18-8, at AA2321-2334), no legitimate trading occurred that resulted in legitimate profits for IA Business customers (*see* Dubinsky Rep. ¶¶ 330-37; Collura Rep. ¶¶ 20-27) and the T-Bill positions listed on IA Business customer statements were fictitious. Customers like Appellants were paid profits from customer funds pooled in BLMIS bank accounts. All this is established by the undisputed testimony of the Trustee's expert witnesses[4] and

---

[3] The propriety trading and market-making businesses are collectively referred to as the "Proprietary Trading Business."

[4] The Trustee offers expert declarations and reports from Lisa M. Collura and Bruce G. Dubinsky to explain how the Ponzi scheme and IA Business operated. These experts in forensic accounting and fraud investigation reached their findings based on analyses of BLMIS's books and records, including bank account statements, transactions and trading activity (*see* Dubinsky Rep., at ¶14; Collura Rep., at ¶¶10-12). Appellants did not depose the Trustee's expert witnesses (*see* Dkt. No. 30, at 9), and Appellants do not offer evidence rebutting the experts but instead take issue with the findings by arguing that the experts are not credible and relied on "inadmissible" books and records. This issue is dealt with *infra* p. 39.

corroborated by the testimony of Madoff and five BLMIS employees – Frank DiPascali, David Kugel, Irwin Lipkin, Enrica Cotellessa-Pitz, and Eric Lipkin – as part of their plea allocutions in related criminal proceedings. (*See e.g.*, Dkt. Nos. 30-2, 30-3, at TA0062-417; Dkt. No. 30, at 37).

The bank accounts used in furtherance of the scheme were the JPMorgan Accounts and the Bankers Trust account #xx-xx0-599. (Dkt. No. 18-3, at AA1475). IA Business customers sent money to BLMIS to purchase securities, and BLMIS pooled the customer money into these bank accounts and used those funds to pay redemptions to other BLMIS customers.

All IA Business customer deposits went into these accounts and all IA Business customer withdrawals came from these accounts. (*See* Dkt. No. 18-3, at AA1482). There were no real accounts for individual customers. The 509 Account and the BT Account were funded by the 703 Account and the 703 Account was funded by customer deposits. Ninety-seven percent of the funds in the 703 Account were customer deposits; the other three percent was derived from cash management activities, which activity was undertaken with existing customer money from the 703 account; no funds flowing into the 703 Account were from sales of securities for customers; and funds in the 703 Account were not used to purchase securities for customers. (*Id.* at AA1477-81).

**D. The Protective Decree and Substantive Consolidation Order**

After Madoff's arrest in December 2008, SIPC sought a protective decree under SIPA § 78eee, asserting that the customers of BLMIS, a member broker-dealer, needed protection under SIPA. The application was approved by the SEC.

The District Court entered the decree and appointed the Irving Picard as Trustee "for the liquidation of the business of [BLMIS] with all the duties and powers of a trustee as prescribed in SIPA." Order ¶ 2, *SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Dec. 15, 2008), ECF No. 4 ("Protective Decree").

Certain creditors also filed a petition for involuntary bankruptcy against Madoff personally, pursuant to Chapter 7 of the Bankruptcy Code, which the District Court allowed. *See SEC v. Madoff*, No. 08-cv-10791 (LLS) (S.D.N.Y. Apr. 1, 2009), ECF No. 37. A separate trustee was appointed in the Chapter 7 case (the "Chapter 7 Trustee").

Thereafter, the Trustee moved for substantive consolidation of the BLMIS liquidation and the Chapter 7 bankruptcy, arguing that BLMIS and Madoff were alter egos, that Madoff used BLMIS as his "personal piggy bank," and that Madoff did not have any other significant source of income other than BLMIS's funds. *See SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. May 5, 2009), ECF No. 196. The Chapter 7 Trustee consented to the relief sought and the bankruptcy court substantively consolidated the BLMIS and Madoff estates. See Order, *SIPC v. BLMIS*, Adv. Pro. No. 08-01789 (SMB) (Bankr. S.D.N.Y. June 10, 2009), ECF No. 252 (the "Substantive Consolidation Order"). All assets and liabilities of the two estates were deemed consolidated as of the date of the filing for liquidation. Under the Substantive Consolidation Order, the Trustee could avoid and recover fraudulent transfers of customer property; the Chapter 7 Trustee could still pursue recovery of non-customer property.

### E.  The Trustee's Adversary Proceeding

On November 30, 2010, the Trustee commenced this adversary proceeding to avoid and recover the sum of $2,622,438, representing the total sum transferred to Seymour Epstein and Shelburne during the two-year period prior to the BLMIS liquidation ("Two-Year Transfers").

The adversary proceeding in this case was one of over 120 filed against transferees to avoid and recover fictitious profits. The Trustee's avoidance actions were pursued with the aim of recovering the fictitious profits from the "net winners" of the BLMIS Ponzi scheme in order to compensate the "net losers" of the BLMIS' Ponzi scheme for their losses.

In 2011, the Appellants moved to withdraw the reference to the bankruptcy court. In 2012, Judge Rakoff remanded the case to the Bankruptcy Court for pre-trial proceedings.

An omnibus motion to dismiss was filed in 2013 by the law firm representing defendants in all the "clawback from net winners" adversary proceedings – including on behalf of the defendants in this case. In the summer of 2015, the bankruptcy court ruled on the omnibus motion to dismiss, granting it in part and denying it in part. Insofar as the motion was granted, the Trustee's "subsequent transferee" claims against Randy Epstein Austin, Robert Epstein, Jane Epstein, and Susan Epstein Gross (who had received some of the Two-Year Transfers) were dismissed without prejudice. *See SIPC v. BLMIS*, 531 B.R. 439, 473-74 (Bankr. S.D.N.Y. 2015). The Trustee did not appeal that decision or refile those claims.

On September 16, 2015, Appellants answered the complaint.

The docket shows that, between 2015 and 2021, the parties to this action engaged in discovery. (*See* Dkt. No. 18-1, at AA3-AA24).

In 2020, Appellants again moved to withdraw the reference. Judge Woods, who handled that motion, referred this matter to the bankruptcy court for proposed findings of fact and conclusions of law.

The Trustee filed for summary judgment on September 9, 2020. The defendants cross-moved for summary judgment on October 9, 2020.

The Bankruptcy Court heard oral arguments on the motions on January 27, 2021 and issued a written decision later that day. The appeal from that decision was wheeled out to this court.

### F.  The Bankruptcy Court's Decision Granting Judgment in Favor of the Trustee

On January 27, 2021, Judge Cecelia G. Morris, Chief Bankruptcy Judge for the U.S. Bankruptcy Court for the Southern District of New York, issued a "Memorandum Decision

Granting Summary Judgment in Favor of Trustee, Determining Funds Held in the Bank Accounts Are Customer Property, and Awarding Prejudgment Interest." (*See* Dkt. No. 18-10, at AA2544).

Chief Judge Morris made the following findings.

Authority to enter a final order. Chief Judge Morris explained that she had authority to enter a final order because the district court had not withdrawn the bankruptcy reference. However, she asked that, to the extent that she did not have authority to enter the judgment, "the District Court construe this decision as proposed findings of fact and conclusions of law."

The Trustee's Entitlement to Avoid and Recover Transfers of Fictitious Profits. Chief Judge Morris found that the Trustee had established each of the three elements of his claim to avoid and recover the transfers of the fictitious profits under 11 U.S.C. § 548(a)(1)(A). These elements are (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with actual intent to hinder, delay, or defraud a creditor.

> i.    *Transfer of an interest of the debtor in property*

In a single paragraph, Chief Judge Morris ruled that, "All monies transferred from the 509 Account or the 703 Account are 'customer property' for purposes of these SIPA cases." As such, she held that the Trustee had satisfied his burden of proof on the first element. She so concluded by applying (erroneously, in the view of this court) the "law of the case" doctrine. (*See infra* at pp. 23-24).

Specifically, Chief Judge Morris found that this element had been proven in two previous BLMIS cases in which the Trustee asserted 11 U.S.C. § 548(a)(1)(A) claims against funds transferred from the JPMorgan Accounts, and where – following bench trials – the courts had found that IA Business transfers from the JPMorgan Accounts "were made by BLMIS," not by Madoff personally. *See Picard v. BAM, l.P. (In re BLMIS)*, 624 B.R. 55, 62 (Bankr. S.D.N.Y.

2020) and *Picard v. Nelson, (In re BLMIS)*, 610 B.R. 197, 206-207 (Bankr. S.D.N.Y. 2019). In

those cases, the court found that the transfers "consisted entirely of fictitious profits" (*Nelson*, 610

B.R. at 233) because "all of the assets and liabilities of the sole proprietorship, including the IA

Business, were transferred to BLMIS via the 2001 SEC Amended Form BD." *BAM*, 624 B.R. at

62; *Nelson*, 610 B.R. at 218. The *Nelson* court explained:

> [Madoff's] representations . . . to the SEC confirm that Madoff Securities ceased to
> operate on January 1, 2001. At that moment, all of its business and business
> property was transferred to BLMIS. No other person or entity retained any of that
> property and the Chase Accounts were maintained by BLMIS to hold customer
> deposits . . .

*Nelson*, 610 B.R. at 218; *see BAM*, 624 B.R. at 62. In each case, the court avoided the transfers

and awarded final judgment in favor of the Trustee.

Chief Judge Morris concluded that these findings were "law of the case" for purposes of

this subsequent fraudulent transfer proceeding and established that the IA Business funds were

BLMIS customer property.

### ii. *Made within two years of the petition date*

The element of whether the transfers were made within two years of the petition date was

uncontested.

### iii. *Intent to defraud and the Ponzi scheme presumption*

As to intent to defraud, Chief Judge Morris found the Trustee was entitled to the benefit of

the so-called "Ponzi scheme presumption." Put otherwise, she found that, because it has long been

well-established that BLMIS operated a Ponzi scheme, the Trustee was entitled to a presumption

that intent to defraud had been proven as a matter of law.

This case was not the first in which Chief Judge Morris had applied the Ponzi scheme

presumption, nor was she the only bankruptcy judge to apply this presumption in a BLMIS case;

she specifically mentioned three cases in which the Trustee asserted claims under 11 U.S.C. §

548(a)(1)(A) to avoid and recover fictitious profits: *Picard v. Cohen*, Nos. 08–01789(SMB), 10-04311 (SMB), 2016 WL 1695296 (Bankr. S.D.N.Y. Apr. 25, 2016), *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317 (Bankr. S.D.N.Y. 2011), and *Picard v. Legacy Capital Ltd.*, 603 B.R. 682 (Bankr. S.D.N.Y. 2019).

In *Legacy Capital*, when deciding the Trustee's motion for summary judgment, the court discussed at length why the Trustee was permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law: "Madoff operated the largest, longest running Ponzi scheme in history . . . Accordingly, the Trustee has established that there is no genuine disputed issue of fact that BLMIS was a Ponzi scheme." *Legacy Capital*, 603 B.R. at 688-93.

In *Cohmad*, the court found, in denying a motion to dismiss, that the Trustee had sufficiently pleaded the element of fraudulent intent because "the breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission." *Cohmad*, 454 B.R. at 330

Finally, in *Cohen*, the parties stipulated that BLMIS's IA Business was a Ponzi scheme, thereby entitling the Trustee "to rely on the *Ponzi* scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent." *Cohen*, 2016 WL 1695296, at *5.

In light of these three cases, as well as the Second Circuit's confirmation, in *Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007), that "the *Ponzi* scheme presumption remains the law of this Circuit," Chief Judge Morris held in this case that "the Trustee has met its burden of proof for summary judgment on this issue [of fraudulent intent]" -- by which the learned bankruptcy judge meant that the there was no genuine issue of

material fact as to fraudulent intent in light of the indisputable fact that BLMIS was a massive Ponzi operation and the record before her contained no evidence to the contrary. In fact, Appellants admit Madoff was engaged in a massive fraud – although they stop short of calling it a Ponzi scheme, claiming in conclusory fashion that "not every fraud is a Ponzi scheme," and insisting that their money was not in fact part of a Ponzi scheme, because their customer statements reflected that Madoff "engaged in massive legitimate purchases and sales of securities" with their money, even if he engaged in fraudulent activities with other people's money. (Dkt. No. 27, at 31). Appellants, like other Madoff customers before them, offered no evidence to counter the testimony of the Trustee's experts, the testimony of various Madoff confederates in related criminal trials, and the admissions of Madoff himself – all of which corroborate that no such legitimate purchases and sales were made as part of the IA Business (*see infra* at pp. 26-29). Instead, they argue in conclusory fashion that these witnesses cannot be believed, that their testimony is inadmissible, and that the BLMIS books and records that demonstrate the extent of the Ponzi scheme were admitted into evidence in error.

Chief Judge Morris went on to reject the Defendants' various defenses:

Trustee Standing. This defense was the flip side of Appellants' argument that the Trustee had failed to prove that the property sought to be recovered was in fact property of the debtor BLMIS, or that Appellants were actually customers of BLMIS. A SIPA Trustee has standing to recover customer property as fraudulently transferred only to the extent that the property is in fact the property of the debtor. As Judge Bernstein explained when rejecting a challenge to the Trustee's standing in *SIPC v. BLMIS (In re BLMIS)*, 531 B.R. 439 (Bankr. S.D.N.Y. 2015), SIPA "'created legal fiction that confers standing on a SIPA trustee by treating customer property as though it were "property of the debtor" in an ordinary liquidation.'" *Id.* at 448 (quoting *Picard v.*

*Fairfield Greenwich Ltd.*, 762 F.3d 199, 213 (2d Cir.2014)). "With this fiction, the Trustee may exercise an ordinary trustee's powers under the Bankruptcy Code to avoid and recover preferential and fraudulent transfers of customer property for the benefit of the customer property estate." *Id.* at 449. "SIPA authorizes him to recover fraudulent transfers of customer property" and, as a "fiduciary that sues as a representative of an insolvent estate to avoid and recover transfers for the benefit of that estate," the Trustee "satisfies the requirement for Article III standing.' *Id.* (citing *Official Comm. of Asbestos Claimants of G–1 Holding, Inc. v. Heyman*, 277 B.R. 20, 33 (S.D.N.Y. 2002)). Judge Bernstein elaborated that where, as here, "the estate of customer property suffered the injury in fact by virtue of BLMIS fraudulent transfers of that property, the Trustee's lawsuits will redress that injury" and thus "the Trustee has established Article III standing." *Id.*

Judge Morris adopted Judge Bernstein's reasoning, and held that, as the Trustee in this case sought to recover fraudulent transfers of customer property, "SIPA plainly gives the Trustee standing to bring these actions."

Defendants were customers of BLMIS. As she had previously held in *BAM,* Chief Judge Morris found the evidence was undisputed that all of the IA Business customers were transferred to BLMIS in 2001, making Defendants were customers of BLMIS, so that "Defendants customer accounts and the Bank Accounts are property of BLMIS and the monies paid to Defendants from those Bank Accounts must be turned over to the Trustee . . ." *See BAM*, 624 B.R. at 62.

The Trustee relied on admissible evidence. Chief Judge Morris rejected the Defendants challenge to the admissibility of the Trustee's expert reports, finding, "This evidence is not just theoretically admissible; it has been admitted by this Court in prior trials." In so holding, she referenced the *Nelson* decision (discussed above), where Bankruptcy Judge Bernstein held that the

same expert's reports were admissible despite the same challenges to admissibility. *See Nelson*, 610 B.R. at 224-230.

Any T-Bill purchases by Madoff were made as part of the ongoing fraud and the information in the customer statements was fictitious. Defendants contended that Madoff actually owned and traded T-bills that were credited to some customer "accounts" – including, they claimed, theirs. They thus argued that the Trustee's contention that Madoff never purchased securities with IA customers' money was false, and that securities bought and sold for these accounts and transfers made in connection therewith were not part of the Ponzi scheme and could not be avoided and recovered by the Trustee. In support, they offered their own statements, which showed holding of T-Bill positions that they alleged had been traded on their behalf.

Chief Judge Morris rejected this argument. She found instead that, "While some T-Bills were purchased as part of the ongoing fraud, the treasuries on Defendants' customer statements were fictitious." In so holding, she cited *Nelson*, where the court, after reviewing the same evidence presented in this case, concluded that any T-Bills that were purchased by Madoff using customer funds did not match those "purchased" for and "held" on behalf of *any* IA Business customers. *Nelson*, 610 B.R. at 213-214. The *Nelson* court ruled that the T-Bill positions that appeared on all customer statements were fictitious. *Id.* As Appellants (who were IA Business customers) offered no evidence that any of the T-Bill positions on their own statements reflected actual trades – other, of course, than the fictitious statements themselves – there was nothing in the record before Chief Judge Morris to undermine this finding.

Defendants were not entitled to a credit for taxes. Chief Judge Morris found that defendants were not entitled to a credit for taxes paid on the fictitious profits. In a single sentence finding, she

stated, "The court has rejected this argument numerous times. *See Nelson*, 610 B.R. at 236-37. No credit shall be given."

Cross-liability. Chief Judge Morris held that the total amount of the judgment in favor of the Trustee -- $2,622,438 – was not joint and several as between Seymour Epstein and Shelburne. Instead, she ruled that the "Trustee shall receive a judgment against the Epstein and a separate judgment against Shelburne" – Shelburne in the amount of the Shelburne's withdrawals ($1,511,900) and Epstein in the amount of his withdrawals ($1,110,538).

Proof of losses. In *In re Bernard L. Madoff Investment Securities LLC*, 830 Fed.Appx. 669 (2d Cir. 2020), the Second Circuit ruled Trustee is entitled, in clawback litigation like this, to rely on BLMIS's books and records as proof of profit withdrawals. The Court of Appeals found that the district court did not "exceed the permissible bounds of its discretion by admitting BLMIS's books and records," and affirmed that profit withdrawal transactions were properly treated as debits to BLMIS customer accounts. *Id.* at 671.

In light of this ruling, Chief Judge Morris held that Trustee was "entitled to rely on BLMIS's books and records" to show proof of profit withdrawals. She added that the Appellants failed to provide "credible contrary evidence demonstrating that the books and records of BLMIS should not be relied on in this case."

Prejudgment interest. The Chief Judge held that a discretionary award of 4% non-compounding prejudgment interest on the judgment amount should be imposed, because, "Defendants, like these, . . . litigate issues that have already been decided by the Court in this case." She explained:

> The Trustee is charged with collecting fictitious profits from net winners so that net losers in BLMIS' Ponzi scheme can be adequately compensated for their losses. He has spent approximately ten years prosecuting this case and cannot be made whole without an award of prejudgment interest. *Moreover, he has spent time and energy*

> *having to defend against legal arguments that have already been decided in these*
> *SIPA cases.* All of Defendants' legal arguments in opposition to this summary
> judgment motion were previously decided and [are] law of the case.

(emphasis added) (citing *Nelson*, 610 B.R. at 237); *see BAM*, 624 B.R. at 63-64. She awarded

prejudgment interest "in the amount of 4%, without compounding, commencing on November 20,

2010 through the date of the entry of judgment in this case."

### G. The Reconsideration Decision

Following Chief Judge Morris' decision, the Appellants argued, in two letters, that the

bankruptcy court erred in finding that it had jurisdiction to enter a final judgment. The Trustee

opposed that argument and Judge Morris rejected it.

Appellants then moved to vacate the judgment, sought entry of a proposed counter-order,

and requested a stay of enforcement of the judgment pending appeal to an Article III Court. The

Bankruptcy Court denied the Appellants' motion in its entirety.

### H. The Appeal

The Appellants filed a notice of appeal on February 4, 2021; it was docketed before this

Court on March 17, 2021.

The Appellants argue that the Bankruptcy Court erred in granting the Trustee's motion for

summary judgment. As grounds, the Appellants argue, *inter alia*, that (1) the Bankruptcy Court

lacked the power to enter a final judgment; (2) the Bankruptcy Court erroneously relied on prior

decisions within the SIPA proceeding as "law of the case"; and (3) the Trustee lacked Article III

standing to recover the transfers. The Appellants further argue that summary judgment for

Appellees was erroneous because (4) Madoff was not operating a Ponzi scheme with the IA

accounts, (5) the Trustee relied on inadmissible evidence, and (6) the Trustee failed to prove any

losses. Finally, even if there were liability, Appellants argued that the Bankruptcy Court

erroneously denied them a credit for taxes they paid on the fictitious profits and should not have

granted the Trustee prejudgment interest. Finally, Appellants argue that judgment should be vacated as to Shelburne, which was dissolved prior to the Trustee's filing of this proceeding; and Appellants argue that the judgment should be vacated as to Jane Epstein, Randy Austin, and Susan Gross as co-successor trustees to Herbert C. Kantor because the Trustee never moved to substitute them as successors or representatives in Kantor's stead.

On November 16, 2021, Appellees notified the Court by letter that Judge Koeltl's decision in *Picard v. JABA Assocs. LP*, 528 F.Supp.3d 219, 234 (S.D.N.Y. 2021) – yet another of these virtually identical fraudulent transfer adversary proceedings against former BLMIS customers – had been appealed to the Second Circuit (No. 21-872). Appellees advised that "the Second Circuit appeal involves one of the issues before this Court—namely, whether the Trustee has met [proven] the first element of his claim under 11 U.S.C. § 548(A)(1)(a)." Appellees did not request a stay pending the outcome of that appeal. Appellants for their part advised, in a letter dated November 18, 2021, that *JABA* has been on appeal since April 2021 and this Court should not wait on the Second Circuit to issue a decision.

While a decision in the *JABA* appeal would provide useful guidance, the appeal before this Court has been pending for almost a year. I conclude that this court has stayed its hand long enough. I render my decision on the understanding that it may have to be vacated should the Second Circuit's conclusions undermine my own.

## STANDARD OF REVIEW

The Court has jurisdiction to hear bankruptcy appeals pursuant to 28 U.S.C. § 158(a). A district court reviews a bankruptcy court's order granting summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party. *In re Lehman Bros. Holdings Inc.*, 526 B.R.

481, 492 (S.D.N.Y. 2014). The *de novo* standard is likewise applied when the bankruptcy court's order is treated as proposed findings of fact and conclusions of law. *See* Fed. R. Bankr. P. 9033(d).

Because I review the decision *de novo* regardless, it makes little practical difference how I rule on the Appellants' first argument, which is that the Bankruptcy Court should not have entered a final judgment. However, I agree with the Appellants that the Bankruptcy Court "may not enter a final judgment on . . . fraudulent transfer claims under the Supreme Court's ruling in *Stern v. Marshall*, 564 U.S. 462, 487 (2012) . . . absent the parties' consent." *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, No. 08–01789 (SMB), 2018 WL 1442312, at *3 (Bankr. S.D.N.Y. Mar. 22, 2018), *as corrected* (Mar. 26, 2018), *R.&R. adopted,* 596 B.R. 451 (S.D.N.Y. 2019), *aff'd sub nom, In re Bernard L. Madoff Inv. Sec. LLC*, 976 F.3d 184 (2d Cir. 2020) (citing *SIPC v. BLMIS*, 490 B.R. 46, 51–52 (S.D.N.Y. 2013) and *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1944–46, 1949 (2015)). *Stern* dictates that "Congress cannot empower Article I courts to finally adjudicate matters 'of private right, that is, of the liability of one individual to another under the law as defined.'" *SIPC*, 490 B.R. at 50 (quoting *Stern*, 564 U.S. at 489). "Resolution of an avoidance action brought under SIPA," which finally adjudicates a matter of private right "require[s] an exercise of the judicial power reserved for Article III courts." *Id.* at 52.

The Appellants did not consent to entry of final judgment by the Bankruptcy Court in this avoidance action, either expressly or impliedly. (*See, e.g.* Dkt. No. 27, at 13-14). Because a Bankruptcy Court cannot finally adjudicate an avoidance action absent consent, Chief Judge Morris could only submit proposed findings of fact and conclusions of law to this Court. *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34-36 (2014). The fact that the district court had not withdrawn the reference – which is the reason why the learned Bankruptcy Judge concluded that she had authority to enter final judgment – is of no moment; as a constitutional matter, a bankruptcy

judge simply cannot enter a non-consensual final judgment in a matter like this one. I thus treat

her decision as a Report and Recommendation that the Trustee's motion should be granted.

## DISCUSSION

The Court does not adopt the Report and Recommendation of the Bankruptcy Court, but

after *de novo* review, I conclude that the Trustee's motion should be granted, because no *genuine*

issue of *material* fact precludes summary judgment.

### I.   The Trustee Has Article III Standing

The Trustee has Article III standing to bring the instant avoidance action. Because the

Trustee sues as a fiduciary of an insolvent estate to recover customer property for the benefit of

that estate, he has Article III standing. *See Picard v. RAR Entrepreneurial Fund, Ltd.*, No. 20-CV-

1029 (JMF), 2021 WL 827195, at *4 (S.D.N.Y. Mar. 3, 2021) (Furman, J.); *Picard v. Lisa Beth*

*Nissenbaum Trust*, No. 20 CV. 3140 (JGK), 2021 WL 1141638, at *9 (S.D.N.Y. Mar. 24, 2021)

(Koeltl, J.); *JABA*, 528 F.Supp.3d at 234 (Koeltl, J.); *SIPC*, 531 B.R. at 448-49 (Bernstein, J.);

*Nelson*, 610 B.R. at 215 (Bernstein, J.).

Appellants argue that the Trustee lacks standing because "the transfers at issue were made

by Madoff, not by [BLMIS]." (Dkt. No. 27, at 6). However, as other judges in this district have

remarked in the face of this same argument, Appellants "'conflate[] subject matter jurisdiction

with the merits of the Trustee's claims.'" *RAR*, 2021 WL 827195, at *4 (quoting *Nelson*, 610 B.R.

at 216). Whether the transfers were made by BLMIS or Madoff goes to the merits of the Trustee's

claim, not to the Trustee's standing or this Court's jurisdiction. As repeatedly and consistently held

in this district, the Trustee is a fiduciary who is suing to recover customer property on behalf of

and for the benefit of BLMIS, an insolvent SIPA estate. The Trustee alleges that the property he

seeks to recover is property of the estate. That alone gives him standing to maintain this avoidance

action. *See RAR*, 2021 WL 827195, at *4.

Appellants' further argument that the *Avellino* decision dictates that "[o]nly the Madoff trustee," Alan Nisselson, has standing to "recover actual transfers by the sole proprietorship" is meritless. *See In re Bernard L. Madoff Inv. Sec. LLC ("Avellino")*, 557 B.R. 89, 110 (Bankr. S.D.N.Y. 2016), *reconsideration denied*, 2016 WL 6088136 (Bankr. S.D.N.Y. Oct. 18, 2016). The Court in *Avellino* held that the Trustee could not recover transfers prior to 2001. *See Nissenbaum*, 2021 WL 1141638, at *10; *JABA*, 528 F.Supp.3d at 235. This case concerns Two Year Transfers made between 2006-2008; thus, *Avellino* has no bearing on the Trustee's standing in this case.

## II.   There is No Genuine Issue of Material Fact As to Any Elements of the Trustee's Claim to Avoid and Recover Fictitious Profits Pursuant to 11 U.S.C. § 548(a)(1)(A).

The standard for granting summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is improper if any evidence in the record from any source would enable a *reasonable* inference to be drawn in favor of the nonmoving party. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its burden, the nonmoving party must produce evidence in the record showing the existence of a genuine issue of material fact and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir. 1993).

Here, the Trustee must establish each of the following three elements to avoid and recover the transfers of the fictitious profits under 11 U.S.C. § 548(a)(1)(A): (i) a transfer of an interest of the debtor in property; (ii) made within two years of the petition date; (iii) with actual intent to hinder, delay, or defraud a creditor. The Trustee has so established.

A. *There Was A Transfer of Interest of the Debtor in Property.*

As a preliminary matter, this Court agrees with Appellants that Chief Judge Morris improperly applied the "law of the case" doctrine to what were, in essence, issues of fact that were decided in favor of the Trustee in prior cases involving different Madoff customer/victims.

The "law of the case" doctrine applies to legal conclusions. It directs that "when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication," that "'rule of law . . . should continue to govern in subsequent stages of the same case.'" *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 165 n. 5 (2d Cir.2000), *cert. denied*, 532 U.S. 920, 121 S.Ct. 1356, 149 L.Ed.2d 286 (2001)). It is a doctrine that "counsels against heedlessly revisiting prior [legal] rulings in a case." *In re Club Ventures Investments LLC*, 507 B.R. 91, 100-101 (S.D.N.Y. 2014) (citing *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 94 (2d Cir.2005)).

Significantly, in a SIPA liquidation like this one, the different adversary proceedings arising within the same liquidation are "one case" for purposes of the doctrine. *See Nelson*, 610 B.R. at 237; *In re Terrestar Corp.*, No. 16-cv-1421 (ER), 2017 WL 1040448, at *4 (S.D.N.Y. Mar. 16, 2017), *appeal dismissed*, No. 17-1117 (2d Cir. June 29, 2017); *Legacy*, 603 B.R. at 700 (citing *In re Motors Liquidation Co.*, 590 B.R. 39, 62 (S.D.N.Y. 2018), *aff'd*, 943 F.3d 125 (2d Cir. 2019)). This means that legal rulings reached by appellate courts in earlier clawback/fraudulent transfer cases can be treated as law of the case in this one.

By contrast, the doctrine of collateral estoppel or "issue preclusion" applies to factual issues and "'bars a party from relitigating in a subsequent proceeding an issue clearly raised in a prior proceeding and decided against that party where the party to be precluded had a full and fair opportunity to contest the prior determination.'" *Johnson v. Watkins*, 101 F.3d 792, 794 (2d Cir. 1996) (quoting *Weiss v. Manfredi*, 83 N.Y.2d 974, 976 (1994)). "Summary judgment is appropriate under the doctrine of collateral estoppel (issue preclusion) when all the material facts in a pending action have been actually and necessarily resolved in a prior proceeding." *Mishkin v. Ageloff*, 299 F.Supp.2d 249, 252 (S.D.N.Y.2004) (citing *State of New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 86 (2d Cir.2000)). The doctrine is specifically limited to material facts actually raised and litigated in a prior proceeding *by a party to that prior proceeding*; it cannot be used across different proceedings to bind parties that were not involved in a prior litigation.

Because law of the case applies to legal, not factual, conclusions, the factual finding – reached after bench trials in *Nelson* and *BAM* – that BLMIS owned, and so has an interest in, the property transferred to Appellants from the JPMorgan Accounts, cannot possibly be "law of the case." *See Nelson*, 610 B.R. at 206-207, 218, 233; *BAM*, 624 B.R. at 58, 62. The learned Bankruptcy Judge – who has presided and multiple trials and other proceedings in which the

evidence overwhelmingly demonstrated that the Trustee's position is factually true – can be certainly forgiven for trying to come up with a reason not to prolong the wasteful re-litigation of this issue. But the solution Chief Judge Morris found is not the correct solution.

That is not to say that certain legal issues raised and decided in other, similar adversary proceedings are not "law of the case" in this proceeding. For example, the Second Circuit's conclusion that BLMIS books and records are admissible as proof of profit withdrawals is a legal conclusion (whether evidence is admissible or not being a question of law) is "law of the case" in all subsequent BLMIS adversary proceedings, including this one (*see infra*, p. 39).

However, Chief Judge Morris mis-read Judge Bernstein's *Nelson* decision by concluding that his "post-trial findings of fact" were "law of the case." Not so. In *Nelson*, Judge Bernstein issued "post-trial findings of fact" after a bench trial, in which he decided that the Two-Year transfers from the JPMorgan Accounts "were made by BLMIS." not Madoff personally. *See Nelson*, 610 B.R. at 206-207. Judge Bernstein expressly stated that this was, "The principal *factual issue* the Court must decide." *Id.* at 206 (emphasis added). The finding itself is listed under the heading "Findings of Fact." Judge Bernstein in that case applied the "law of the case" doctrine only to certain legal findings, such as whether the defendants were "entitled to a credit for taxes paid on account of fictitious profits." *Id.* at 236-37. He correctly did not apply the doctrine to his factual findings; despite the unitary nature of adversary proceedings in a single SIPA liquidation, like this one, factual findings made in one litigated proceeding cannot simply be grafted onto separate adversary proceedings involving different parties – even though the issues are identical.

But the fact that Judge Morris relied on the wrong doctrine does not mean that Appellants are entitled to a trial. I happen to agree with my colleague Judge Koeltl that there is no "dispute of material fact that the [JPMorgan accounts] were used as part of [BLMIS] and not for Madoff

personally" and "contained investor funds for [BLMIS] and not for Madoff personally." *See Nissenbaum*, 2021 WL 1141638, at *9-11; *JABA*, 528 F.Supp.3d at 236. But in my opinion, that is because the evidence introduced in this proceeding raises no genuine issue of fact on that score.

The evidence from the Trustee's experts shows that the JPMorgan Accounts were transferred to the LLC in 2001, and the transfers made from those accounts were of BLMIS customer funds. That evidence was not controverted in the slightest by Appellants, who introduced no evidence at all tending to cast the experts' conclusions into doubt. They simply assert, in conclusory fashion, that these experts (and, apparently, Madoff's employees and Madoff himself) should not be believed, while what is printed on their customer account statements should be believed. This "showing" fails to raise any genuine issue of material fact that would entitle them to a trial on whether there was a transfer of interest of the debtor in property.

Let us examine the record as to each aspect of this issue.

Appellants contend that the Trustee has not satisfied the first element as a matter of law because the JPMorgan Accounts from which the transfers were made were never the property of BLMIS. Appellants so contend by arguing that, in 2001, the IA Business and its bank accounts were not handed over with the rest of the business to BLMIS but remained Madoff's property. (*See* Dkt. No. 18-3, at AA1447-48).

But the fact that Appellants say this is so does not make it so. The Trustee has submitted undisputed evidence demonstrating that, in 2001, Madoff represented to the SEC that the sole proprietorship ceased to operate and that *all* of its business and business property was transferred to BLMIS, such that no other person or entity retained any of that property. Specifically, Madoff did not file a new application for SEC registration; retaining the same SEC registration number, he certified through the 2001 SEC Amended Form BD that he "transfer[ed] to successor [BLMIS]

all of predecessor's assets and liabilities related to predecessor's business . . ." According to that form, *all assets or liabilities of the sole proprietorship* were "assumed by the successor" and no "accounts, funds, or securities of customers of the applicant [Madoff] are held by or maintained by [any] other person, firm, or organization." Thus, by his own representations to the SEC, Madoff handed over his entire business – including the IA Business and its commercial checking accounts, the JPMorgan Accounts – to BLMIS.

The bank statements for the JPMorgan Accounts post-2001 reflect this change: Following the 2001 conversion of the business, the JPMorgan Account statements were no longer addressed to "Bernard L. Madoff" but were addressed to "Bernard L. Madoff Investment Securities" at the attention of BLMIS employees at the BLMIS business address, not to Madoff personally. (*See e.g.*, Dkt. No. 18-5, at AA1761, AA1802). And the JPMorgan Account statements stated on their face that they were "Commercial Checking" accounts, not Madoff's personal accounts. (*See e.g.*, Dkt. No. 18-5, at AA1779).

Additionally, the Trustee's expert, Dubinsky, testified that the T-Bill assets that were listed on customer statements of IA Business customers, including Appellants here, were fictitious. (*See* Dubinsky Rep, at ¶ 227 and Table 5)[5]; *see JABA*, 528 F.Supp.3d at 238-39; *Nissenbaum*, 2021 WL 1141638, at *12–13; *RAR*, 2021 WL 827195, at *8-9; *Nelson*, 610 B.R. at 214, 234 n.37; *Legacy*, 603 B.R. at 691; *Picard v. BAM*, 608 B.R. 165, 176 (Bankr. S.D.N.Y. 2019). Dubinsky analyzed the T-Bills held by the (legitimate) Proprietary Trading Business and by the (fraudulent) IA Business and compared the unique security identifiers of the specific T-Bills allegedly held to the records at the Depository Trust Corporation, which serves as the clearing house for treasuries. His analysis revealed that those unique security identifiers matched the T-Bills reportedly held for the

---

[5] Appellants did not depose the Trustee's expert (*see* Dkt. No. 30, at 9), and Appellants do not offer a rebuttal expert.

Proprietary Trading Business, but that none of the T-Bills' unique security identifiers matched those for T-Bills purportedly held on behalf of IA Business customers. (*See* Dubinsky Rep. at ¶¶ 225-227). Dubinsky also verified that the T-Bills BLMIS held did not match the trade date, volume, price, security description, and maturity date as those listed in IA Business customer account statements. (*See id.* at ¶ ¶228-229). He was therefore able to conclude that the T-Bills listed on IA Business customer statements were fictitious.

Dubinsky's report and testimony are corroborated by various admissions in the Madoff-related criminal cases, including Madoff's admissions under oath and the testimony of Frank DiPascali, a now-deceased BLMIS employee, who testified in the criminal trial of Daniel Bonventre, BLMIS's operations manager. (*See* Dkt. No. 30-1, at TA0015–TA0037 at 4803:23–4804:21 (Dec. 4, 2013); 4921:7–12, 4930:6–4931:5, 4931:12–4933:13, 4961:15–4962:22 (Dec. 5, 2013); 5344:24–5346:3 (Dec. 10, 2013); 6950:25–6951:9 (Jan. 13, 2014)); *see also United States v. Bonventre*, No. 10-cr-228 (LTS) (S.D.N.Y.). In that case, "'DiPascali's direct testimony established that the T-Bill trades appearing on the customer statements were fabricated . . . actual T-Bill purchases were never allocated to the IA Business customers.'" *JABA*, 528 F.Supp.3d, at 239 (quoting *Nelson*, 610 B.R. at 228-29). DiPascali testified that he "created false account statements reflecting false transactions." *Id.* Madoff likewise "admitted under oath that he did not execute trades on behalf of his IA Business clients." *Id.*

Of course, only admissible evidence can be relied on in connection with a motion for summary judgment, and Appellants claim that it is error to consider DiPascali's testimony because he is a "convicted felon," who died before Appellants had an opportunity to depose him. My colleague Judge Koeltl addressed this argument in both *Nissenbaum* and *JABA*, explaining that "on balance, and in the interests of justice, the testimony is sufficiently reliable to be admitted

under Rule 807." *JABA*, 528 F.Supp.3d, at 233; *Nissenbaum*, 2021 WL 1141638, at *8. DiPascali "testified in person for 16 days under oath and was subjected to cross-examination. There is no evidence that DiPascali later recanted his testimony, and his unavailability is due to his death, not to any fact that would suggest unreliability of his past testimony." *JABA*, 528 F.Supp.3d, at 233. After considering the evidence and the parties' arguments, I agree wholeheartedly with Judge Koeltl. DiPascali's testimony is reliable and would be admitted at the trial in this action, so may be considered in connection with this motion. I also conclude that the "various plea allocutions" from the Madoff and his confederates "are admissible under Federal Rules of Evidence 803(22) and 807, as several courts considering this issue in similar contexts have held." *Id.* (citing cases). I note, however, that all of this evidence simply corroborates what Dubinsky found after his extensive analysis: the IA Customers, like everyone else who invested with Madoff, were victims of his terrible fraud. Even if this corroborative evidence were not admissible, Dubinsky's testimony establishes that fact.

In order to raise a genuine issue of material fact on this score, Appellants needed to offer evidence to support their position that Madoff personally retained possession of the JPMorgan Accounts or the IA Business more generally. They did not do so – not a scintilla, let alone the kind of testimony that would be needed to counter Dubinsky's detailed analysis. Instead they challenge the credibility of the Trustee's experts – though they offer no evidence tending to show that their testimony is incredible – and argue that the IA Business was not handed over to the LLC when the rest of the business was, and was in fact maintained as a separate enterprise, because: (1) Madoff failed to check a box on his 2001 SEC Amended Form BD indicating that he operated the IA Business; (2) until August 2002, bank statements for the 703 Account at JPMorgan were still issued to "Bernard L. Madoff" rather than to BLMIS; (3) Madoff did not write a letter to Chase

Bank in 2001 to advise it of the change in legal status; and (4) checks drawn on the 509 Account at JPMorgan continued to bear Madoff's name, rather than the name of BLMIS.

Insofar as their argument rests on the alleged ownership of T-Bills, Appellants did not conduct their own analysis of the T-bills or submit any testimony – expert or otherwise – tending to show that the T bill listed on their customer statements matched T-Bills that were actually purchased and traded. Moreover, Appellants' only rebuttal is that the expert's report should be disregarded because Dubinsky allegedly perjured himself in the *Nelson* trial, and so should not be believed. Judge Koeltl has previously dismissed this same argument as lacking any evidentiary support, explaining, "The defendants present no countervailing evidence, but instead accuse Dubinsky of perjuring himself by selectively quoting his [*Nelson*] trial testimony. However, his testimony was consistent with his report . . . the defendants do not produce any evidence disputing the Dubinsky Report . . . aside from questioning Dubinsky's credibility." *JABA*, 528 F.Supp.3d, at 238-239.

So too here. Just as in *JABA* and *Nissenbaum*, Appellants have offered no countervailing evidence tending to contradict the testimony of Dubinsky. And they are certainly in no position to contradict the admissions of Madoff himself that he never bought any T-Bills for his IA Customers (*see e.g.*, Dkt. No. 30-2, at TA0089), or the testimony of DiPascali that there were no such trades and he personally falsified the account statements reflecting false transactions.

There is, therefore, no genuine issue of material fact to try: the undisputed evidence establishes that T-Bill positions listed on Appellants' statements were fictitious and BLMIS did not legitimately trade equities for its IA Business customers. *See JABA*, 528 F.Supp.3d at 238-39; *Nissenbaum*, 2021 WL 1141638, at *12–13; *RAR*, 2021 WL 827195, at 8-9; *Nelson*, 610 B.R. at 214; *Legacy*, 603 B.R. at 691.

As far as the arguments relating to the alleged separateness of the IA Business are concerned, the Trustee does not dispute any of the four points raised by Appellants as a matter of fact. But he argues that none of them raises a genuine issue of material fact that would counter the expert testimony or lead a *reasonable* trier of fact to conclude that Madoff did not turn his entire fraudulent enterprise over to BLMIS in 2001.

I agree with the Trustee. As has been noted by other courts in the BLMIS liquidation (most recently, Judge Koeltl), "'forms filled out improperly [and] business names used interchangeably on bank accounts and checks[ ]are the sleights of hand that one would expect to see when exhuming the remnants of a Ponzi scheme.'" *JABA*, 528 F.Supp.3d at 235 (quoting *Bam*, 624 B.R. at 60). As Trustee correctly points out, the relevant inquiry – the *material* fact – is whether the accounts are the property of BLMIS and the funds in those accounts belonged to BLMIS customers – not whether Madoff kept his bank "apprised of the mechanics of his fraudulent scheme" or conformed all of his records to the change in corporate form that he indubitably made and registered with the SEC, and to which he admitted after he was arrested. (Dkt. No. 30, at 28).

The fact that Madoff was operating his business as a massive fraudulent scheme is undisputed and indisputable. The Amended Form BD makes clear on its face that all assets previously owned by the sole proprietorship, including the JPMorgan Accounts, were transferred to BLMIS in 2001. Madoff's representations to the SEC in 2001 about the transfer of the entirety of his business, business property, assets and liabilities to BLMIS is dispositive of that fact, and means that all bank accounts and customer funds existing at that time were transferred to BLMIS – whether or not Madoff checked all the boxes, or changed the name on the checks drawn on the 509 account, or sent a contemporaneous letter to Chase advising it of the change in corporate form. *See JABA*, 528 F.Supp.3d at 235. Madoff and his confederates testified under oath that, from and

after 2001, BLMIS owned everything, from the JPMorgan Accounts to the "investment advisory business, the vehicle of [Madoff's] wrongdoing." (*See e.g.*, Dkt. No. 30-2, at TA0085-87). The fact that Chase failed to make the necessary administrative changes to the 703 account for some months after the corporate changes were registered with the SEC raises no genuine issue on that score.

The failure to check a box is particularly meaningless, as the IA Business was not registered with the SEC until 2006; thus, the IA box did not need to be checked in 2001, when the assets and customer accounts (including Appellants' accounts) were transferred to BLMIS. When Madoff did finally register the IA Business in 2006, he registered it *as BLMIS*, using the same SEC registrant number as BLMIS. The only conclusion that a reasonable trier of fact could reach is that the IA Business was transferred to BLMIS in 2001 with the rest of the business assets and was registered under BLMIS in 2006 – which happens to be within the period for recovering fraudulent transfers.

Appellants contend that they are entitled to a trial on the issue of whether the JPMorgan Accounts were transferred to BLMIS because my colleague Judge Furman, in *Picard v. RAR Entrepreneurial Fund, Ltd.*, 2021 WL 827195 (S.D.N.Y. Mar. 3, 2021), concluded that there was a genuine issue of material fact on this point that precluded summary judgment in favor of the Trustee. I rarely disagree with Judge Furman, but in this instance, I do.

*RAR* is yet another avoidance proceeding brought by the BLMIS Trustee to recover fictious profits from yet another net winner – in other words, another proceeding identical to this one. Apropos of the contention that the debtor BLMIS had no interest in transfers from the IA Business bank accounts, Judge Furman recognized that "two similarly situated defendants made precisely this argument before the Bankruptcy Court and lost after trials." *Id.* at *10 (citing *Nelson*, 610 B.R.

at 218 and *BAM*, 624 B.R. at 61).[6] But he concluded that the fact that the previous cases went to

trial on the question of BLMIS's interest in the transfers, "support the conclusion that summary

judgment cannot be granted for the Trustee on this element." *Id.* Judge Furman did acknowledge

that the Trustee's evidence on this element was "compelling," that "The outcomes of these cases

[*Nelson* and *BAM*] suggest that RAR faces an uphill battle and that the Trustee is ultimately likely

to prevail on its claim." *Id.* at \*11. However, he noted that "the Trustee does not argue that the

outcomes of these cases are binding on RAR" and "thus, has forfeited any such argument." *Id.* He

concluded based on much the same evidence presented in this case that: "the Court cannot say that

no reasonable factfinder could conclude that either Madoff himself or the sole proprietorship

retained ownership over the 703 and 509 Accounts even after the LLC's formation in 2001." *Id.*

As a result, he denied the motion for summary judgment and set the case for trial.[7]

The Trustee argues that this Court should decline to follow *RAR* and instead rule as Judge

Koeltl did in *JABA* and *Nissenbaum*. In those cases, Judge Koeltl concluded that there was no

longer any dispute of material fact that the transfers from the JPMorgan accounts were transfers

of customer property by BLMIS. On what appears to be essentially the same record as in this case

– prepared by the same attorneys – Judge Koeltl saw no evidentiary basis to dispute the Trustee's

contention that the IA Business was part of BLMIS, that the JPMorgan Accounts held BLMIS

customer funds, and that the debtor BLMIS has an interest in the transfers from the JPMorgan

---

[6] The two prior adversary proceedings in the BLMIS liquidation that have gone to trial on the exact same contentions regarding the IA Business and the JPMorgan Accounts, on the exact same evidence, are *BAM* and *Nelson*. Specifically, as explained above, the *Nelson* and *BAM* courts found that the evidence proves that, in 2001, the Madoff sole proprietorship ceased to operate and all its business, business property, assets and liabilities were transferred to BLMIS, including the IA Business and customers. The JPMorgan Accounts were maintained by BLMIS from that point forward and held BLMIS customer deposits, which were transferred out as fictitious profits to other customers in the course of the Ponzi scheme. *See Nelson*, 610 B.R. at 206-207, 218, 233; *BAM*, 624 B.R. at 58, 62.

[7] On a variety of other issues, Judge Furman held as Chief Judge Morris has in this case, including that the Trustee established standing, that the Trustee relied on admissible evidence, and that the Ponzi scheme presumption applied. He also rejected many of the same defenses already rejected in related BLMIS adversary proceedings.

Accounts at issue. As in this case, the defendants in Judge Koelt's cases offered no expert testimony in support of their position that the JPMorgan Accounts were owned by Madoff and failed to offer any other evidence that raised a genuine issue of material fact on the point. He found that the Trustee's evidence "demonstrates that there is no dispute of material fact that the accounts were used as part of the LLC and not for Madoff personally." *JABA*, 528 F.Supp.3d at 235.

I agree with Judge Furman that the results in the earlier cases are not "binding" on subsequent litigants; because each case involves different defendants, the repeated, unanimous factual findings in favor of the Trustee on this point do not collaterally estop the next net winner in the queue. However, after reviewing the record in this case *de novo*, I simply cannot locate any evidence that raises a genuine issue of material fact that would entitle Appellants to a trial on this issue. Although it appears that the record here is as much the same as the record before Judge Furman in *RAR* (and the same as before Judge Koeltl in *JABA* and in *Nissenbaum*), I disagree with Judge Furman that there is any evidence that raises a genuine issue of material fact. I do not see how a *reasonable* finder of fact could conclude that Madoff retained possession over the JPMorgan Accounts following the 2001 conversion of the sole proprietorship to the LLC, BLMIS. I so conclude, not because others have done so before me after trial, but because there is simply nothing in the record on which Appellants can hang a plausible argument that they were situated any differently than any other Madoff customer/victim. In the absence of evidence raising a genuine issue of material fact, I will not force the Trustee to go through yet another trial, and waste still more of the estate's assets, proving facts that Appellants have failed to controvert on the record before me except with wishes and hopes.

### B. The Timing Element is Uncontested.

The element of whether the transfers were made within two years of the petition date is

uncontested. The petition date was December 11, 2008, and the transfers that the Trustee seeks to avoid and recover were made between December 11, 2006 and December 11, 2008. There is no evidence that the Trustee is seeking to recover for time-barred transfers. The Trustee has established that the transfers were made within two years of the petition date.

### C.   The Trustee Has Established Fraudulent Intent as a Matter of Law.

As all of my colleagues who have opined on this issue have found, the Trustee is entitled to the benefit of the Ponzi Scheme Presumption, and so can prove fraudulent intent as a matter of law. (*See* Dkt. No. 18-10, at AA2548); *Legacy Capital*, 603 B.R. at 688-93; *Cohmad*, 454 B.R. at 330; *Cohen*, 2016 WL 1695296, at *5; *RAR*, 2021 WL 827195, at *6; *Nissenbaum*, 2021 WL 1141638, at *11; *JABA*, 528 F.Supp.3d at 236-37; *SIPC*, 531 B.R. at 470-72; *BAM*, 624 B.R. at 58; *Nelson*, 610 B.R. at 233. It is well settled that, "Madoff operated the largest, longest running Ponzi scheme in history," *Legacy Capital*, 603 B.R. at 688-93, and "the breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption. . ." *Cohmad*, 454 B.R. at 330.

Appellants here argue – as defendants in similar proceedings have argued – that BLMIS was not a Ponzi scheme because BLMIS was "engaged in massive legitimate purchases and sales of securities" with their money, which they claim is evidenced by the T-Bill positions listed on their customer account statements. (Dkt. No. 27, at 31). Not so. As discussed above, the uncontroverted evidence demonstrates that the T-Bills listed on customer statements were fictitious and BLMIS was not engaged in any legitimate purchase and sale of securities. Because there is no genuine issue of fact that all of Madoff's "purchases" for his customers were fraudulent, there is no evidence that tends to rebut the presumption.

Here, as was true in the previous, similar BLMIS adversary proceedings, "there is ample admissible evidence to support a finding that the transferor operated a Ponzi scheme and that the transfers made . . . were in furtherance of that scheme — and no reasonable factfinder could conclude otherwise." *See RAR*, 2021 WL 827195, at *6. The Trustee established the existence of a Ponzi scheme in this case, and Appellants have certainly not introduced any evidence tending to undermine that well-established fact. This means the Trustee has proven fraudulent intent as a matter of law.

## III.    The Appellants Are Not Entitled to a Tax Credit for Taxes Paid on Fictitious Profits.

The Appellants are not entitled to a credit for taxes paid on the fictitious profits. This point – which raises a question of law, not of fact -- has been correctly rejected numerous times before in the BLMIS liquidation. *See JABA*, 528 F.Supp. 3d at 245.

The rational for denying a credit for taxes has been explained as follows:

> (i) there is no principled basis to limit the offsets to taxes and not permit offsets for other expenses relating to, or the uses of, the fictitious profits, (ii) the offset would introduce complex problems of proof and tracing and reduce the plaintiff's ability to recover assets and (iii) the amount of the offset would differ depending on the defendant's financial situation and come at the expense of the other victims

*Cohen*, 2016 WL 1695296, at *15 (citing *Donell v. Kowell*, 533 F.3d 762, 779 (9th Cir.), *cert. denied*, 555 U.S. 1047, 129 S.Ct. 640, 172 L.Ed.2d 612 (2008)); *see Picard v. The Estate (Succession) of Doris Igoin (In re BLMIS)*, 525 B.R. 871, 893 (Bankr. S.D.N.Y. 2015). "[O]ffsetting tax payments would create a slippery slope for other expenses paid, that 'one could argue that every purchase made with the gains from the scheme would not have been made "but for" receipt of that money. If each net winner could shield his gains in their entirety in this manner . . . the multitude of victims who lost their entire investment would receive no recovery.'" *Nelson*, 610 B.R. at 237 (quoting *Donell*, 533 F.3d at 779). More generally, in a case involving a Ponzi scheme like this one, investors are not entitled to a credit for taxes on proceeds from the scheme.

*See Janvey v. Alguire*, 647 F.3d 585, 602 (5th Cir. 2011) (district court did not err in declining to offset tax amounts paid on proceeds from the Ponzi scheme); *Sender v. Buchanan* (*In re Hedged-Invs. Assocs., Inc.*), 84 F.3d 1286, 1290 (10th Cir. 1996) (declining to allow investor to recover tax and interest payments paid out of Ponzi scheme investment).

### IV.    The Trustee Is Entitled to Prejudgment Interest.

Prejudgment interest has been routinely awarded against similarly situated defendants in the BLMIS liquidation. *See JABA*, 528 F.Supp.3d at 245-46 (citing *Picard v. Lowrey*, No. 08-01789 (SMB), 2018 WL 1442312, at *15 (Bankr. S.D.N.Y. Mar. 22, 2018), *R.&R. adopted*, 596 B.R. 451 (S.D.N.Y. 2019), *aff'd*, 976 F.3d 184 (2d Cir. 2020) and *Nelson*, 610 B.R. at 238). Prejudgment interest in this case has been awarded at 4% interest rate, which represents the prime rate on December 15, 2008, the date of the protective decree beginning the BLMIS liquidation. *See JABA*, 528 F.Supp.3d at 246 (citing *BAM*, 624 B.R. at 65).

Under the law of this Circuit, an award of prejudgment interest "should be a function of (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc. v. Local Union No. 3, Intern. Broth. of Elec. Workers, AFL-CIO*, 955 F.2d 831, 833-34 (2d Cir. 1992). Here, as my colleague Judge Koeltl has explained, the award of 4% prejudgment interest serves to compensate the Trustee for time and costs spent litigating against "defendants who have resisted the law of the case" and for the attendant "loss of the use of the Two-Year Transfers for the years that this litigation has lasted," as well as reducing the profits to the defendants from having withheld the funds. *JABA*, 528 F.Supp.3d at 245-46.

As Chief Judge Morris noted below, Appellants have insisted on relitigating "issues that have already been decided by the Court in this case" and forced the Trustee to "spen[d] time and energy having to defend against legal arguments that have already been decided in these SIPA cases." (Dkt. No. 18-10, at AA2553). I agree. Appellants have done nothing more than regurgitate arguments already made and rejected, without casting the slightest doubt on the evidence that has been the cornerstone of every one of these cases or offering evidence to demonstrate that they are somehow different than everyone else who "invested" with Bernie Madoff. They have wasted the Trustee's time and resources and the Court's as well.

For the foregoing reasons, an award of prejudgment interest at the prime rate of 4% from the date this action was filed until the date judgment is entered is justified.

## V.   Judgment Is Proper as to Shelburne, the Seymour Estate, and Muriel Epstein as the Executrix of the Seymour Estate and Trustee of the Seymour Trusts.

The Judgment Related to the Shelburne Account. The Appellants argue that the judgment avoiding $1,511,900 in transfers of fictitious profits from the Shelburne Account should be vacated as to Shelburne, because the corporation was dissolved on December 28, 2009. The Appellants argue that a corporation cannot be sued for pre-dissolution events after the corporation's affairs are wound up and fully adjusted. Because the complaint was filed almost a year after Shelburne was wound up, the Appellants argue that the judgment against Shelburne should be vacated.

The Trustee counters that Shelburne held a BLMIS account and received the transfers the Trustee seeks to avoid and recover and urges that a party can sue a defunct corporation on claims that existed prior to dissolution, because a corporation continues to exist – even after the winding up of its affairs -- until its affairs are "fully adjusted." The Trustee further argues that whether the Trustee will be able to collect from the dissolved corporation goes to enforcement – not entry – of the judgment.

The Trustee is correct.

"Whether a corporation has the capacity to be sued is a question of state law." *Next Millenium Realty, LLC v. Adchem Corp.*, 690 Fed.Appx. 710, 715 (2d Cir. 2017). "In New York, this question is governed by New York Business Corporation Law ('BCL') §§ 1005 and 1006." *Id.* Under the latter, an aggrieved party may seek "any remedy available to or against such [dissolved] corporation, its directors, officers or shareholders for any right or claim existing or any liability incurred before such dissolution." BCL § 1006(b). "Thus, the dissolved corporation exists for 'the purpose of and for as long as is necessary to satisfy and provide for its debts and obligations and it may sue or be sued on these obligations until its affairs are fully adjusted.'" *Next Millenium Realty*, 690 Fed.Appx. at 715 (quoting *Rodgers v. Logan*, 121 A.D.2d 250, 503 N.Y.S.2d 36, 39 (1st Dep't 1986)). The Second Circuit has clarified that a corporation's affairs are "fully adjusted" within a "reasonable period of time" after dissolution and that "winding up cannot continue indefinitely." *Id.* at 716 (quotation omitted). In *Next Millenium Realty*, for example, the Second Circuit found that more than 25 years between a corporation's dissolution and filing suit was not reasonable; by that time, the Circuit found, the corporation's affairs had been "wound up" and "fully-adjusted." *Id.*; *cf. Trustees of Tapers' Ins., Annuity and Pension Funds v. Albee Drywall Partitions Corp.*, No. 91-cv-1014 (DLC), 1996 WL 294306 (S.D.N.Y. 1996) (corporation dissolved in 1980 still liable for pre-dissolution conduct where the complaint was filed in 1991).

Here, the Trustee commenced this action less than a year after Shelburne was dissolved: Shelburne was dissolved on December 28, 2009 and the Trustee commenced this action on November 30, 2010. None of the parties to this appeal cites a single case which suggests that a corporation can cease to be liable for its pre-dissolution obligations less than one year after its dissolution. Nor is the Court able to find any such case. In the only case cited by Appellants – *Next*

*Millenium Realty* —25 years passed between corporate dissolution and the filing of the lawsuit. This case is nothing like *Next Millenium Realty*.

The Court thus concludes that Shelburne retained the capacity to be sued on the pre-suit transfers at the time the Trustee brought suit, less than a year after Shelburne's dissolution. The Trustee is entitled to the entry of judgment against Shelburne.

The Judgment Related to the Seymour Account. Appellants also argue that the judgment avoiding $1,110,538 in transfers of fictitious profits from the Seymour Account should be vacated as to Jane Epstein, Randy Austin, and Susan Gross, as successor co-trustees, because the Trustee never moved to appoint them as successors or representatives of Herbert Kantor following his death in 2014. The Trustee does not oppose Appellants' motion as to Jane Epstein, Randy Austin, and Susan Gross, but argues that the judgment should not be vacated against the Seymour Estate or Muriel Epstein as the Executrix of the Seymour Estate and Trustee of the Seymour Trusts. Therefore, the judgment will be vacated against the successor trustees, but not against the Seymour Estate and Muriel Epstein as the Executrix of the Seymour Estate and Trustee of the Seymour Trusts.

## VI.    The Admissibility of the Books and Records of BLMIS is Law of the Case

Finally, I reject the argument that the Trustee relied on inadmissible evidence. Appellants contest the admissibility of the same expert reports and BLMIS records that have been previously challenged and repeatedly deemed admissible including on the Trustee's motion for summary judgment in avoidance actions like this one. *See JABA*, 2021 WL 1141638, at *6-8; *Nissenbaum*, 2021 WL 1141638, at *6-8; *RAR*, 2021 WL 827195, at *5, 7-8. As Chief Judge Morris noted below, even the Second Circuit has agreed that BLMIS's books and records can be admitted. *See In re Bernard L. Madoff Investment Securities LLC*, 830 Fed.Appx. at 671. The Appellants' challenge to the admissibility of the expert reports and BLMIS records fails as a matter of law.

## CONCLUSION

For the foregoing reasons, the Trustee's motion for summary judgment is granted in favor of the Trustee.

The Clerk of this Court is directed to enter judgment as follows:

- **The Epstein Judgment**: $1,110,538.16 against the Estate of Seymour Epstein and Muriel Epstein as Executrix of the Seymour Estate and Trustee of the Trusts created by the Last Will and Testament of Seymour Epstein, plus prejudgment interest at a rate of 4% from November 30, 2010 through the date of this order.

- **The Shelburne Judgment**: $1,511,900.39 against Shelburne Shirt Company, Inc., plus prejudgment interest at a rate of 4% from November 30, 2010 through the date of this order.

This constitutes the decision and order of the court. This is a written opinion.[8]

Dated: February 17, 2022

_(signature)_

_____
U.S.D.J.

BY ECF TO ALL PARTIES

---

[8] As noted above, I quite understand Chief Judge Morris' desire to find a way to stop the unnecessarily wasteful relitigation of points already well settled. It depletes the estate and burdens both the Bankruptcy Court and this Court. If the _JABA_ appeal and the anticipated appeal from this decision (which should be consolidated with the _JABA_ appeal if that be possible) do not put an end to this, the courts may have to consider whether the refusal to accept repeated rulings of both fact and law gives rise to a violation of the Federal Rules of Civil Procedure on the part of any party or attorney.